IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 24-77 (MN) |
| | ) | |
| DEBORAH EVANS MOTT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Benjamin L. Wallace, United States Attorney, Claudia L. Pare, Assistant United States Attorney, Hannah J. McCollum, Trial Attorney, Office of the United States Trustee, Wilmington, DE, – attorneys for United States of America

John S. Malik, LAW OFFICES OF JOHN S. MALIK, Wilmington, DE, Randy M. Mott, LAW OFFICES OF RANDY M. MOTT, Washington, D.C. – attorneys for Defendant

October 1, 2026
Wilmington, Delaware

Maryellen Noreika

**NOREIKA, U.S. DISTRICT JUDGE:**

Bankruptcy offers struggling companies a bargain. It provides an orderly process for a company to deal with debts it cannot pay; but in return the debtor must fully and truthfully disclose its financial circumstances, which allows creditors to recover what they are owed under the law. There can thus be an incentive for certain insiders to hide the debtor's assets in an attempt to keep for themselves what under the Bankruptcy law is owed to others. Here, that incentive overcame Defendant Deborah Mott's better judgment. The government has proven beyond a reasonable doubt that Mott intentionally lied in an attempt to shield assets from the reach of creditors.

Following a four-day criminal bench trial, this Court finds that Mott is GUILTY with respect to her false responses to questions 18 and 30 on the Statement of Financial Affairs, which are listed in Count I of the indictment. This Court finds that Mott is NOT GUILTY with respect to the remaining statements in the indictment, including all statements listed in Count II, because the government has not proven falsity or criminal intent for those representations beyond a reasonable doubt.

## I. <u>PROCEDURAL BACKGROUND</u>

On August 1, 2024, a grand jury in the District of Delaware returned a two-count indictment against Mott. (D.I. 3). Count I accuses Mott of making four false statements under penalty of perjury in a bankruptcy filing in violation of 18 U.S.C. § 152(3). (*Id.* at 9-10). Count II accuses Mott of making three false statements under oath in a deposition in violation of 18 U.S.C. § 152(2). (*Id.* at 10). Because this Court finds that the government has proven its case only

with respect to two statements in Count I, this opinion does not further address Mott's deposition statements or the legal standard that applies to those statements.[1]

On June 18, 2026, Mott waived her right to a jury trial, the government consented, and the Court approved. (D.I. 100). This Court held a bench trial on June 22 through June 25, 2026. At the Defendant's request, the parties submitted post-trial briefing and proposed findings of fact. (D.I. 107, 108, 120, 121, 122, 127, 129,[2] 130). This opinion constitutes the Court's findings of fact pursuant to Federal Rule of Criminal Procedure 23(c).

## II. LEGAL STANDARD

To obtain a conviction, the government must prove each element of the charged offense beyond a reasonable doubt. *Estelle v. McGuire*, 502 U.S. 62, 69 (1991). Under 18 U.S.C. § 152(3), "[a] person who . . . knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28[3], in or in relation

---

1 Pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure, Mott requested the Court state its specific findings of fact for any findings of guilt. The Government did not request that the Court state its specific findings of fact.

2 Mott's motion for a sur-reply (D.I. 129) is hereby granted.

3 Section 1746 provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

to any case under title 11 . . . shall be fined under this title, imprisoned not more than 5 years, or both." The offense can be broken down into the following elements:

1. There was a bankruptcy proceeding under Title 11 of the United States Code;

2. The defendant made a declaration, certificate, verification, or statement or series of declarations, certificates, verifications, or statements under the penalty of perjury in relation to the bankruptcy proceeding;

3. The declaration, certificate, verification, or statement under the penalty of perjury related to some material matter;

4. The declaration, certificate, verification, or statement under the penalty of perjury was false; and

5. The defendant made the declaration, certificate, verification, or statement under penalty of perjury knowingly and with intent to defraud.

*See* 18 U.S.C. § 152(3); Fed. Crim. Jury Instr. 7th Cir. § 152(3); 8th Cir. Crim. Jury Instr., § 152.

## III. FINDINGS OF FACT

### A. Background

#### 1. Mott

1. Mott was the controlling and majority member of Team Systems International, LLC ("TSI"). (Tr.[4] at 28:22-23 (Ketler), 127:20-23 (Homony)).

---

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
(Signature)".

[4] The transcripts of the four-day trial (D.I. 112-115) are collectively referred to as "Tr."

2. Mott controlled other entities, including Team Systems International Southeast LLC ("TSI SE"), TSI Education and Training, Inc. ("TSI Education"), and Addy Road, LLC ("Addy Road"). (GX 56[5]; GX 58; Tr. at 28:24-29:4, 56:10-19 (Ketler), 263:15-264:23 (Mathes), 491:6-12 (Mott)).

3. Mott has a background in finance and accounting, with an undergraduate degree in business and economics and a graduate degree in finance and accounting from George Washington University. (GX 14 ¶ 6; Tr. at 488:12-20 (Mott)).

4. Mott has worked in government contracting for more than 30 years. (GX 14 ¶ 6; Tr. at 436:1-4, 488:22-24 (Mott)).

**2. <u>TSI</u>**

5. Before bankruptcy, TSI operated as a government contractor.

6. TSI was formed in 2001 as a Delaware limited liability company. (GX 14 ¶ 3; Tr. at 27:25-28:5 (Ketler)). Mott has been a member of TSI since it was formed. (GX 14 ¶ 6; Tr. at 436:1-4, 488:22-24 (Mott)).

7. TSI had only four members and no employees. (GX 14 ¶¶ 18-19).

8. TSI's members and their ownership percentages were: Mott (75%), Steven Acosta (20%), Mott's son, Christopher Mott (4%); and John Maciorowski, Mott's current husband (1%). (GX 13 at 13; GX 14 ¶ 18; Tr. at 489:4-6 (Mott)).

9. Mott and Acosta formed TSI's Management Committee. (GX 14 ¶ 18; Tr. at 489:7-9 (Mott)).

---

5 The government's admitted exhibits are referred to as "GX." Defense exhibits are referred to as "DX."

10. TSI contracted with various government agencies and was paid by the government. (GX 14 ¶ 4; Tr. at 28:6-7 (Ketler), 490:1-3 (Mott)).

11. Among other past contracts, TSI helped deliver fuel around the world, including to the United Arab Emirates and Mexico, and helped provide water bottles in the aftermath of natural disasters and emergencies. (GX 14 ¶ 9; GX 15 at 9; Tr. at 371:13-372:17, 375:5-16 (Christopher Mott); Tr. at 442:13-17 (Mott)). TSI contracted with other entities to perform the physical shipping and movement of fuel and water. (Tr. at 491:13-17 (Mott)).

12. To receive a government contract, TSI would often have to provide proof of financial ability or adequate capital to perform that contract. (Tr. at 380:2-381:5 (Christopher Mott), 439:23-440:8 (Mott)).

13. Mott administered TSI's finances. (Tr. at 436:5-8, 489:10-19 (Mott), 386:21-387:12 (Christopher Mott)). She acted as TSI's bookkeeper. (Tr. at 436:5-8, 489:15-25 (Mott)). She handled TSI's accounting and was the only person who entered information into TSI's accounting system. (Tr. at 490:18-25 (Mott)). She had access to TSI's online bank accounts and reviewed TSI's monthly bank statements. (Tr. at 489:17-25 (Mott)). Mott opened TSI's bank accounts, wrote checks from those accounts, and closed several of them. (Tr. at 387:10-11 (Christopher Mott), 436:5-8, 490:10-15 (Mott); *see, e.g.*, GX 27A at 1; GX 28 at 3; GX 29 at 213; GX 30A at 5-6; GX 30C at 1; GX 31B at 1; GX 33A at 1). Mott kept track of when TSI was paid by the government and what TSI owed to others. (Tr. at 490:1-9 (Mott)). Mott was responsible for preparing TSI's taxes. (Tr. at 490:16-17 (Mott)). And she filed corporate documents for TSI with the states of Delaware and Florida. (Tr. at 491:1-5 (Mott)).

14. Mott was "familiar with the day-to-day operations, business, and financial affairs of TSI," and she certified this under penalty of perjury. (GX 14 ¶ 1).

15. TSI's members did not take a salary. (Tr. at 439:15-16 (Mott)). Instead, because TSI was a pass-through entity, the members took distributions of TSI's profits. (Tr. at 180:7-181:19 (Homony), 302:3-7 (Mathes), 438:14-439:22 (Mott)).

### 3. **Florida Litigation**

16. As described below, TSI filed for bankruptcy following a legal judgment against it for over $6 million dollars.

17. To fulfill one of its government contracts, TSI entered into a consulting agreement with two companies, GPDEV, LLC and Simons Explorations, Inc. ("the Creditors"), under which the Creditors connected TSI to water suppliers. (GX 14 ¶ 9; Tr. at 444:12-18 (Mott)).

18. TSI and the Creditors disputed the amount TSI owed to the Creditors under this contract, and as a result, in September 2018, the Creditors sued TSI in the United States District Court for the Northern District of Florida ("the Florida District Court") for breach of contract, *GPDEV, LLC and Simons Exploration, Inc. v. Team Systems International, LLC*, No. 18-cv-00442 (N.D. Fla.) ("the Florida Litigation"). (GX 1; GX 14 ¶ 10).

19. After a jury trial from August 23 through August 25, 2021, the jury found in favor of the Creditors, resulting in a judgment order from the Florida District Court that the Creditors could recover a total of $6,246,075.78 in principal and interest from TSI. (GX 2 at 1-2; GX 14 ¶¶ 11-12). Mott testified that she believes this judgment was wrong, and her view is that the Creditors had sought an illegal modification of their contract with TSI. (Tr. at 445:12-448:6 (Mott)).

20. TSI appealed the judgment but did not have the money to post a bond, which would have stayed execution of the judgment. (GX 3 at 1, 29; GX 4 at 3-4; GX 25 at 155:6-9, 156:7-13, 157:10-18; Tr. at 512:2-513:6 (Mott)). Both the Florida District Court and the Eleventh Circuit denied TSI's efforts to obtain a stay pending appeal, and the Creditors proceeded with post-judgment discovery and collection efforts. (GX 4 at 4, 7; GX 9 at 2).

21. The Florida District Court ordered TSI to produce, among other things, bank statements and tax returns by January 14, 2022. (GX 5 at 1; GX 6 at 4-5; GX 14 ¶ 14; Tr. at 46:11-47:2 (Ketler), 448:14-24 (Mott)). When TSI did not do so, the Creditors moved for an order to show cause. (GX 9; GX 10).

### 4. Bankruptcy Proceedings

22. On January 18, 2022, before the hearing on the Creditors' motion, TSI filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"), *In re Team Systems Int'l, LLC*, Case No. 22-10066-CTG (Bankr. D. Del.). (GX 13; Tr. at 27:9-12 (Ketler)). As a result of TSI's bankruptcy filing, all proceedings in the Florida Litigation were stayed. (GX 11 at 1; GX 12 at 1).

#### i. Bankruptcy Filings

23. TSI's bankruptcy counsel, Robinson & Cole ("R+C"), prepared TSI's bankruptcy petition using information Mott provided. (GX 62 at 1-3; Tr. at 109:22-111:8 (Edmonson), 458:14-15 (Mott)). Mott reviewed the petition before R+C filed it and authorized R+C to affix her electronic signature. (*Id.*).

24. TSI's bankruptcy petition warned Mott that "Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both." (GX 13 at 5, 12).

25. Mott stated that TSI "sought the protections of chapter 11 to enable [TSI] to gain some breathing room" after the Creditors' judgment. (GX 14 ¶¶ 16-17).

26. In addition to the bankruptcy petition, debtors in bankruptcy must file schedules of assets and liabilities ("the Schedules"). (Tr. at 84:4-18 (Nimeroff)). The Schedules are intended to provide a detailed snapshot of all the debtor's assets and liabilities as of the date of the bankruptcy filing. (*Id.*; Tr. at 88:8-16 (Nimeroff); *see generally* GX 15).

27. Debtors must also file a statement of financial affairs ("the SOFA"). (Tr. at 84:4-18 (Nimeroff)). The SOFA, which requires debtors to disclose detailed backward-looking financial data, is intended to provide a look into the debtor's past financial condition and the potential causes of the financial or other distress that led to the bankruptcy (loss or dissipation of assets, ongoing litigation, environmental issues, governance changes, and large transfers especially to corporate management, among others). (Tr. at 84:11-18, 88:17-23, 92:9-13 (Nimeroff); *see generally* GX 16).

28. Mott's electronic signature – "/s/ Deborah Evans Mott" – appears on the petition, Schedules, and SOFA. (GX 13 at 5; GX 15 at 11; GX 16 at 9). Mott signed each under the penalty of perjury, certifying that all the documents and the information in them were true and correct based on her reasonable belief following an examination of the information in the documents. (*Id.*).

29. To fill out the SOFA, and consistent with its normal practice, R+C provided Mott with a questionnaire. (Tr. at 108:9-109:5, 111:9-15 (Edmonson); *see generally* GX 64).

30. Consistent with its normal practice, R+C did not conduct its own independent review of TSI's accounts or finances and instead relied on the information provided by Mott. (Tr. at 109:18-21 (Edmonson); *see also* Tr. at 87:3-88:1 (Nimeroff)).

31. R+C did, however, engage in an iterative process by asking Mott follow-up questions about answers Mott provided in R+C's questionnaire and requesting additional information. (Tr. at 108:9-109:12, 115:18-116:15 (Edmonson); *see e.g.*, GX 65 at 1; GX 67 at 1; GX 68 at 1, 3; GX 69 at 1; GX 70 at 1; GX 71 at 1; GX 72 at 1-2; GX 73 at 1; GX 74 at 2).

32. On January 26, 2022, TSI filed its Schedules and SOFA, which Mott reviewed in advance. (GX 15; GX 16; Tr. at 119:16-120:3 (Edmonson), 458:16-19, 459:15-22, 493:20-494:3 (Mott)).

33. Mott signed the SOFA by authorizing R+C to affix her electronic signature. (Tr. at 119:17-21 (Edmonson), 459:23-460:3 (Mott); *see also* Tr. at 42:21-43:2; GX 26 at 17).

34. Mott signed TSI's SOFA under penalty of perjury, declaring she "examined the information in this Statement of Financial Affairs and any attachments and has a reasonable belief that the information is true and correct." (GX 16 at 9). Above the signature and declaration under the penalty of perjury, the SOFA contained a warning regarding the criminal consequences of bankruptcy fraud. (*Id.*). Above the signature line, the SOFA states: "I declare under penalty of perjury that the foregoing is true and correct." (*Id.*).

35. At the same time as R+C was preparing TSI's Schedules and SOFA, the Creditors were also asking TSI to produce numerous documents, including tax returns and bank statements, which the Bankruptcy Court ordered TSI to provide. (GX 74 at 1; Tr. at 124:8-20 (Edmonson)). As a result, R+C also attempted to collect these documents from Mott for production to the Creditors. (GX 74 at 1; GX 75 at 1-2; GX 76 at 1-2; GX 77 at 1-2; GX 78 at 1; Tr. at 124:7-19 (Edmonson)).

36. In response to repeated requests for status updates, Mott gave excuses for why she had not yet provided the documents including, for example, that her scanner was broken. (Tr. at 121:14-123:10 (Edmonson); *see, e.g.*, GX 77 at 1).

37. On February 4, 2022, TSI filed an amended Schedule E/F, which Mott also signed under the penalty of perjury, to add Bering Straits Logistics Services, a nonpriority unsecured

creditor, after it filed a notice of appearance. (GX 18 at 3-4; GX 79 at 1; Tr. at 123:18-124:7 (Edmonson)).

ii. February 2022 Deposition

38. On February 7, 2022, Mott was placed under oath and sat for a deposition by video, which was taken by the Creditors in the bankruptcy case. (Tr. at 125:3-21 (Edmonson); GX 25 at 1, 10).

39. Mott testified about various topics concerning TSI. When asked if she had "an interest in any business that has exchanged money, property, or funds with TSI," Mott responded, "Yeah, no." (GX 25 at 127:15-128:5). When asked whether Addy Road did anything for TSI, Mott responded, "I don't believe so, no." (GX 25 at 32:3-4). When asked "did the debtor transfer any money or property to Addy Road, LLC?" Mott responded, "Not to my knowledge." (GX 25 at 137:3-5).

40. Immediately after the February 2022 deposition, the Creditors accused Mott of committing perjury by providing false testimony. (GX 82 at 1-2; Tr. at 138:22-139:8 (Edmonson)).

41. To refute these allegations, R+C attempted to obtain supporting documents and explanatory information from Mott that could be produced to the Creditors and that could be used to amend TSI's bankruptcy filings. (Tr. at 138:15-139:8 (Edmonson); GX 83 at 1-3; GX 84 at 1; GX 88 at 1; GX 89 at 1-2; GX 90 at 1; GX 92 at 1-2; GX 96 at 1). R+C urged TSI to "address these issues immediately," meaning that "TSI must, with complete candor, explain the situations and/or correct the factual issues that raise issues pertaining to the alleged false testimony." (GX 84 at 1). R+C also explained that the Creditors "are making very serious claims and allegations of perjury"; that "[n]ot only is it wise to correct any incorrect or mistaken testimony (whether intentional or unintentional in its making), but ethics rules as it applies to attorneys requires us to

seek to correct any testimony that we have reason to believe may be false promptly"; that the "issues need to be addressed and resolved immediately," with "no delays"; and that "[i]t should not be difficult to do that much less everything else that we have requested." (GX 96 at 1).

42. Neither Mott nor any other TSI member provided R+C with the documents required to amend TSI's SOFA or her deposition. (Tr. at 138:22-144:2 (Edmonson)).

43. In an email to R+C on February 15, 2022, Mott's stated that "[t]he SOFA and Schedules . . . need to be correct before the interview with the DOJ auditor this Thursday." (GX 83 at 1). Other than this, neither Mott nor any other TSI member made any request for R+C to amend TSI's SOFA. (Tr. at 142:7-16 (Edmonson)).

44. On February 18, 2022, R+C moved the Bankruptcy Court to withdraw as counsel for TSI based upon "irreconcilable differences" and TSI's failure to "fully cooperate" and "promptly communicate necessary information." (GX 20 ¶¶ 2, 3(a), 3(b), 4-5). The Bankruptcy Court granted R+C's motion to withdraw without a hearing. (Tr. at 144:5-10 (Edmonson)).

iii. Conversion to Chapter 7

45. After an evidentiary hearing in March 2022, the Bankruptcy Court converted TSI's case from Chapter 11 to Chapter 7 for cause. (GX 19 at 1; Tr. at 159:2-11 (Homony)). The Bankruptcy Court ordered that TSI "[i]mmediately turn-over to the chapter 7 trustee any and all records and estate property under their dominion, control and custody." (GX 19 ¶ 3A; Tr. at 161:5-18 (Homony)).

46. On the same day, the U.S. Trustee appointed George Miller as TSI's Chapter 7 trustee ("the Chapter 7 Trustee"). (GX 21 at 1; Tr. at 159:2-17 (Homony)). The Chapter 7 Trustee retained an accounting and consulting firm, Miller Coffee Tate, to assist him in carrying out his statutory duties. (Tr. at 157:15-158:4, 159:18-160:2 (Homony)).

47. In general, a Chapter 7 trustee steps into the shoes of the debtor – replacing management and possessing and controlling the debtor's assets and property. (Tr. at 80:13-82:6 (Nimeroff)). A Chapter 7 trustee's primary statutory duty is to maximize the value of estate assets for the benefit of creditors. (Tr. at 79:23-82:7 (Nimeroff), 157:15-158:4 (Homony)). That duty encompasses many tasks, including liquidating physical assets and litigation. (*Id.*). A Chapter 7 trustee is also tasked with evaluating and investigating the debtor's prepetition conduct to identify potential causes of action. (*Id.*). For instance, a Chapter 7 trustee may explore "su[ing] people for preferential fraudulent transfers to try to recover money that can be used to pay creditors off." (Tr. at 81:10-12 (Nimeroff)).

48. The Chapter 7 Trustee requested that TSI turn over its financial records, tax returns, financial statements, bank statements, transaction records, and records concerning remaining assets, among other things. (Tr. at 160:17-162:24 (Homony)).

49. Mott, the primary custodian of TSI's records, did not turn over all the records that the Chapter 7 Trustee requested. (Tr. at 163:5-164:19 (Homony) ("Some were completely missing, . . . others were incomplete")). Mott failed to turn over complete bank records, complete tax returns, complete internal financials, electronic records, and access to TSI's accounting system or software. (*Id.*). Mott did not provide a complete set of records for any of TSI's bank accounts, producing only a subset of records for some and none for others. (Tr. at 164:4-12, 196:4-10, 200:5-14 (Homony)).

50. Despite both informal requests and two orders of the Bankruptcy Court, Mott never turned over all of TSI's financial records, and the Chapter 7 Trustee is still missing "some of the most critical records" from TSI. (Tr. at 164:18-165:24, 166:9-18 (Homony)).

51. The TSI records that Mott did produce to the Chapter 7 Trustee "are so incomplete and in disrepair that you don't know what's real." (Tr. at 202:2-203:8, 204:5-18 (Homony) ("none of these records make sense"; "[we] don't know what's real"; "there is no ledger. I have no idea, I have no idea what's in – I don't even know if one exists. The tax returns don't equal the transaction reports. The transaction reports don't equal the bank statements.").

52. The Chapter 7 Trustee subpoenaed "various banks to receive original clean copies of records." (Tr. at 165:25-166:8 (Homony)).

53. After reviewing records from third-party custodians, the Chapter 7 Trustee found transfers that were not recorded in either TSI's internal records or on its SOFA, and also found numerous transfers that were recorded in TSI's internal records but were not disclosed on TSI's SOFA. (Tr. at 166:9-168:6, 171:10-172:10 (Homony)).

54. The Chapter 7 Trustee also reviewed TSI's 2019 and 2020[6] tax returns and compared them to the members' K-1s – which are tax filings that, if properly recorded and filed, should have shown the annual distributions received by each member from TSI. (Tr. at 179:11-183:19, 202:2-203:8, 204:5-18 (Homony)). TSI's 2019 and 2020 K-1s reflected that no member, including Mott, had received any distributions from TSI in either year. (Tr. at 181:20-183:3 (Homony); GX 100; GX 101). This is irreconcilable with TSI's records, which show distributions going out to the members in each of those years. (Tr. at 203:11-204:18, 205:9-206:4 (Homony) ("when you compare it to what's in the company records, it's night and day, they got money out in '19 and '20, it's not on the tax returns. I don't know how you reconcile those two things")).

[6] The Chapter 7 Trustee filed TSI's tax return for tax year 2021. (GX 102 at 1-2; Tr. at 184:9-185:21 (Homony)).

TSI's records were inconsistent and confusing to professionals. (Tr. at 203:5-8, 204:7-18 (Homony)).

iv. September 2022 Deposition

55. On September 12, 2022, Mott was placed under oath and sat for a deposition by video taken by attorneys for the Chapter 7 Trustee. (GX 26 at 8:1-9; Tr. at 172:11-23 (Homony)).

56. Mott testified under oath that she had a finance and accounting background, had electronically signed TSI's SOFA after reviewing it, and that she was the person responsible for TSI's accounting. (GX 26 at 11:9-14, 17:6-16, 22:2-15; Tr. at 173:9-174:23 (Homony)).

57. Mott testified that she would have been the person at TSI responsible for preparing and filing TSI's tax returns. (GX 26 at 38:15-39:5; Tr. at 175:24-176:5 (Homony)). Mott testified that TSI's 2018 and 2019 tax returns had been filed with the IRS but that she did not recall whether an outside accounting firm assisted with those tax returns. (GX 26 at 39:13-24; Tr. at 176:6-13 (Homony)). Mott further testified that any transaction noted in TSI's internal monthly transaction reports as "K-1" would indicate that that transfer was a K-1 distribution to a member "and that should foot to the amount available for distribution to members" on TSI's tax return. (GX 26 at 48:1-49:19).

58. At the deposition, Mott testified under oath that she could not recall several things. She testified she could not recall how she came to join TSI or who TSI's other members were when she joined. (GX 26 at 11:21-12:10). She testified that she could not recall whether she reviewed TSI's SOFA before it was filed, and she denied involvement in its preparation. (GX 26 at 17:9-13). She testified that she could not recall how TSI would record a payment to a vendor in TSI's books and records. (GX 26 at 22:16-23:5). She testified that she had no recollection of who "primarily used" the TSI computer used for accounting, and she stated that she did not recall if anyone other than herself used that computer. (GX 26 at 25:7-26:14, 27:6-28:7, 30:3-8). She

testified that she could not recall if she had help with TSI's internal accounting in the last five years. (GX 26 at 24:24-25:6, 26:2-9). She testified that she could not recall whether TSI's Management Committee kept minutes. (GX 26 at 34:2-5). She testified that she had "no way to recall" who other than her had access to TSI's electronic bank records. (GX 26 at 78:12-24). Following a break, Mott testified that she could not recall if she spoke to anybody about her testimony during the break. (GX 26 at 75:5-76:1).

59. Mott also testified under oath that she had "no recollection at this point in time" who controlled Addy Road. (GX 26 at 86:1-6). She also testified under oath that she could not recall what business Addy Road was in. (GX 26 at 87:17-19). When asked whether she was involved with Addy Road, Mott responded "I'm sorry. I thought this was about TSI." (GX 26 at 87:20-22).

**5. <u>Witnesses</u>**

60. The government's first witness was FBI Special Agent Brittany Ketler. (Tr. at 24:7-12 (Ketler)). Agent Ketler worked for the FBI for approximately eight years investigating various crimes, including financial crimes, and she was the lead case agent for the investigation into Mott. (Tr. at 24:24-26:16 (Ketler)).

61. The government's next witness was Jamie Nimeroff, a bankruptcy lawyer, who testified as an expert in bankruptcy. (Tr. at 67:8-23 (Nimeroff)).

62. The government then called Jamie Edmonson, a bankruptcy attorney at R+C. (Tr. at 105:16-106:10 (Edmonson)). Edmonson and R+C represented TSI during Chapter 11 bankruptcy proceedings, and Edmonson communicated directly with Mott in the course of the representation. (Tr. at 106:18-22, 107:24-108:2, 144:9-12 (Edmonson)).

63. The government's next witness was William Anthony Homony, an employee of the consulting firm Miller Coffey Tate. (Tr. at 156:23-157:6 (Homony)). Miller Coffey Tate is often

engaged by Chapter 7 trustees to assist in maximizing the value of assets for the benefit of creditors, which includes "evaluating and investigating" the debtor. (Tr. at 156:23-158:4 (Homony)). Here, Miller Coffey Tate was retained by the Chapter 7 Trustee. (Tr. at 159:2-8 (Homony)). Homony and others at Miller Coffey Tate investigated and analyzed TSI's financial circumstances. (Tr. at 205:21-23 (Homony)).

64. The government then called FBI forensic accountant Sara Mathes. (Tr. at 206:19-23 (Mathes)). In the course of her employment with the FBI, Mathes has investigated complex financial crimes and bankruptcy fraud. (Tr. at 207:13-18 (Mathes)). Mathes was involved in the investigation into Mott, and she reviewed bank statements, checks, wire information, cashier's checks, and financial documents, among other things. (Tr. at 209:10-10-15 (Mathes)).

65. The government's next witness was Jamie King, an attorney at the law firm Tunnel & Raysor in Delaware. (Tr. at 317:23-318:14 (King)). Among other things, King testified that Tunnel & Raysor was retained by Addy Road to perform a real estate settlement regarding a property in Bethany Beach, Delaware. (Tr. at 319:6-14 (King)).

66. The government's final witness was Renee McClain, a court witness coordinator and (previously) a taxpayer advisory specialist and tax examiner clerk for the IRS. (Tr. at 333:21-334:16 (McClain)). McClain reviewed documents from the IRS database, including tax returns, related to TSI, TSI SE, TSI Education, Addy Road, and Mott. (Tr. at 335:12-25 (McClain)).

67. After hearing testimony, the Court finds that the government's witnesses were all credible.[7]

68. The first witness for the defense was Christopher Patrick Mott – Deborah Mott's son. (Tr. at 370:1-6, 386:9-10 (Christopher Mott)). Christopher Mott was involved in TSI's

---

[7] The Court found Mr. Homony to be a particularly credible witness.

business and generally testified about TSI's contracting work. (Tr. at 370:1-386:6 (Christopher Mott)). Christopher Mott testified that he had nothing to do with TSI's finances, did not have access to TSI's bank accounts, and that his mother was in charge of the finances at TSI. (Tr. at 386:21-387:11 (Christopher Mott)). Christopher Mott's testimony has little relevance to the charges at hand.

69. The defense's next witness was Erin Weinberg, a manager at an accounting firm and a certified fraud examiner. (Tr. at 397:5-398:14 (Weinberg)). Weinberg confirmed that her testimony was limited to confirming that the transfers listed on exhibit A of a document the Chapter 7 Trustee filed with the Bankruptcy Court appeared in TSI's bank statements. (Tr. at 428:7-22 (Weinberg)). Her testimony has minimal, if any, probative value in this case.

70. The defense next called Mott to the stand. Mott testified about each of the allegedly false statements in the indictment. (Tr. at 430:16-25 (Mott)). Mott's testimony directly challenged the government's case, particularly on the issues of falsity and intent. But for the reasons provided in this opinion, this Court does not find most of Mott's testimony to be credible.

71. The defense's final witness was Jason Davidson, who has experience in computer engineering, computer forensics, and software development. (Tr. at 535:13-536:7 (Davidson)). Davidson was put forth primarily to help the defense rebut the government's assertion that Mott whited-out portions of certain documents that the Chapter 7 Trustee received. (Tr. at 547:9-12, 548:1-18, 550:12-551:2, 558:1-5 (Davidson)). The Court did not find Davidson's testimony or methodology to be persuasive. But the Court finds that the white-out issue is unresolved and will not rely on that issue in this decision.

**B. <u>The False Statements</u>**

72. The government has proven its case with respect to two of Mott's responses on TSI's SOFA. These false responses are discussed below.

1. **<u>Question 30: Insider Payments</u>**

73. Question 30 on the SOFA is titled "Payments, distributions, or withdrawals credited or given to insiders." (GX 16 at 8). It asks: "Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?" (*Id.*).

74. In response, the box labeled "No" is filled in, and no accounts are listed. (*Id.*).

75. Certain transactions, however, are listed in response to Question 4 of the SOFA, which is titled "Payments or other transfers of property made within 1 year before filing this case that benefited any insider." (GX 16 at 4). Question 4 provides:

> List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

(*Id.*).

76. In response, the following transactions are listed:

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1. Christopher Mott<br>415 East Pine Street<br>Orlando, FL 32801<br>Member | 3/31/21<br>6/9/21<br>6/18/21<br>6/23/21<br>6/28/21<br>7/20/21<br>7/23/21<br>7/30/21<br>8/3/21<br>8/11/21<br>8/30/21 | $42,352.00 | K-1 2020 Distributions and Expense Reimbursements |
| 4.2. John Maciorowski<br>705 Riverside Drive<br>Ormond Beach, FL 32176<br>Member | 8/31/21 | $10,000.00 | Expense Reimbursement |
| 4.3. Steven Acosta<br>3901 Blue Sage Drive<br>Prosper, TX 75078<br>Member | 4/15/21<br>6/16/21<br>6/30/21<br>7/30/21<br>8/3/21<br>8/31/21 | $119,804.00 | K-1 2020 Distributions and Expense Reimbursement |

(*Id.*).

77. For Mott's benefit, this Court will consider the transfers disclosed in response to question 4 to be incorporated in response to question 30. Criminal intent cannot be established for concealing transfers that were explicitly disclosed somewhere on the SOFA. The government does not press this point.

78. Mott was responsible for the answers to questions 4 and 30. Mott provided the information to R+C to draft the SOFA; it was an iterative process with significant back-and-forth; Mott reviewed the SOFA before it was filed; and Mott authorized R+C to affix her electronic signature on the SOFA. (*Supra* ¶¶ 28-34).

79. In sum, Mott represented on the SOFA that the only "value" TSI provided insiders in "any form" in the year before filing the bankruptcy case was $172,156 worth of payments to Christopher Mott, John Maciorowski, and Steven Acosta. (GX 16 at 4, 8).

**a. <u>Falsity</u>**

80. This representation was false.

81. In the one-year period before TSI's bankruptcy (or from January 18, 2021, to January 17, 2022), Mott transferred a total of $3,175,202.17 to herself, John Maciorowski, Christopher Mott, Steven Acosta, Tyler Evans, and TSI SE. (Tr. at 237:2-7 (Mathes); GX 110).

82. Mott received $250,000. (*Id.*).

83. Maciorowski received $50,000. (*Id.*).

84. Christopher Mott received $169,447.00. (*Id.*).

85. Acosta received $328,263.54. (*Id.*).

86. Tyler Evans, Mott's nephew, received $84,000. (*Id.*).

87. TSI SE received $2,293,091.63. (*Id.*).

88. Each of these individuals and entities is a TSI insider. (*See* GX 16 at 3 (defining insiders to "include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor."); Tr. at 94:2-95:14 (Nimeroff)).

**b. <u>Knowing and Fraudulent Intent</u>**

89. Criminal intent is the crux of this case. Ultimately, this Court finds it is beyond a reasonable doubt that Mott acted with the requisite knowing and fraudulent intent.

90. Mott was aware she was under obligations to be truthful. She authorized her signature on the SOFA – just as she had with the bankruptcy petition and Schedules – under penalty of perjury, immediately beneath warnings that making a false statement could carry criminal penalties. (*Supra* ¶¶ 23-24, 28, 34; GX 13 at 5; GX 15 at 11; GX 16 at 9).

91. Mott was aware of the transfers at issue. She was TSI's majority owner, was extensively involved in its day-to-day operations, and handled its finances. (*Supra* ¶¶ 1,4, 9, 13, 14).

92. Mott did not act out of pure confusion. She is an experienced businesswoman with a graduate degree in finance and accounting. (*Supra* ¶¶ 3, 4, 13).

93. As noted above, Mott was actively involved in the preparation and submission of the SOFA. (*Supra* ¶¶ 28-34). Mott filled out R+C's questionnaire, asked questions, and reviewed the final SOFA before authorizing her signature. (*Supra* ¶¶ 29-32).

94. In particular, R+C filled out the responses to questions 4 and 30 based on information that Mott provided. The sequence of emails explained below (*infra* ¶¶ 95-100) demonstrates that Mott intended to provide false responses to these questions.

95. On January 20, 2022, Mott asked Edmonson about the definition of "payment" in the R+C questionnaire, and, over email, Edmonson provided Mott the language associated with SOFA Question 4 verbatim. (GX 65 at 1; GX 16 at 3; Tr. at 113:4-7 (Edmonson)). Edmonson also wrote that "[t]his would include any payment made to any member for payroll, vacation, expense reimbursements, imputed income, etc." (GX 65 at 1). In response to Edmonson's email, Mott asked, "If it is the director's after tax money from a prior tax year does it constitute a 'payment'?" (*Id.*). Edmonson responded that after-tax money "goes more to Question 32 [of the R+C questionnaire] on page 32 - payments, distributions, or withdrawals credited or given to insiders." (*Id.*). Mott then asked, "Tax year basis?" which Edmonson confirmed. (*Id.*). Question 32 of R+C's questionnaire asks for "withdrawals or distributions credited or given to an insider" and is similar in substance to Question 30 of the SOFA. (*Compare* GX 64 at 36 *with* GX 16 at 8).

96. Mott was thus directed to – and asked questions about – the particular questions at issue here, and she was told that payments of "after tax money" were responsive to a question on the SOFA.

97. Five days later, on January 25, 2022, Edmonson asked Mott over email to "[p]lease send me the list of payments to the members within the year before the bankruptcy filing." (GX 71 at 1). Edmonson also attached drafts of the Schedules and SOFA and indicated she wanted to file the documents "ASAP before the [Creditors] file their motion to dismiss." (*Id.*). In the draft SOFA attached to Edmonson's email, no payments were listed in response to SOFA Questions 4 and 30. (GX 71 at 14-16, 19).

98. That same day, Mott emailed Edmonson and attached a list of payments to TSI members in the year before TSI's bankruptcy, which included K-1 distributions and expense reimbursement payments to Christopher Mott, Maciorowski, and Acosta. (GX 72 at 1-2; Tr. at 118:19-119:6 (Edmonson)). Mott did not list any transfers to herself or to any companies in which she held an interest. (GX 72 at 2).

99. The next day, Edmonson asked, "Debbie, did you not have any distribution payments to yourself from TSI?" (GX 73 at 1; Tr. at 119:7-16 (Edmonson)). Mott replied, "Nope. My non government residential construction business supported me. I did not spend much time on TSI matters in 2021." (*Id.*).

100. Thus, when specifically and repeatedly asked about "payments to the members within the year before the bankruptcy filing" and "distribution payments to yourself from TSI," Mott failed to provide a truthful response.

101. Among other things, Mott's conspicuous refusal to identify distribution payments to herself – totaling $250,000 in the prior year – demonstrates that she intended to lie.

102. Further, Mott's disclosure of some (but far from all) insider payments indicates her fraudulent intent. Mott testified at trial that, in her opinion, she should have disclosed "none" of the payments she disclosed in response to question 4 of the SOFA because none of the payments

were related to "debts." (Tr. at 461:14-462:7 (Mott)). But Mott never persuasively explained her partial disclosure. Far from suggesting innocence, partial disclosure is exactly what one would expect from a savvy individual who intended to hide assets. Leaving the form blank might generate suspicion; disclosing a smattering of transfers creates a veneer of truthfulness.

103. Mott testified that she lacked criminal intent for several reasons.

i. Capital Accounts

104. Mott testified that, at the time she signed the SOFA, she did not believe she had to disclose certain distributions from members' "capital accounts" because, according to Mott, TSI's operating agreement only allowed members to "take out our distributions in the year after we've earned them." (Tr. at 441:19-442:12, 468:25-470:24 (Mott)). Thus, Mott testified she did not disclose anything in response to question 30 because the members "didn't receive any distributions for 2021 because we wouldn't get those until 2022." (*Id.*).

105. Mott testified that the members' "capital accounts" were not separate bank accounts; rather, they were funds in TSI's bank accounts that members had a right to receive. (Tr. at 483:9-484:17 (Mott)). According to Mott, at the end of each year, TSI's profit passed through to the TSI members' capital accounts. (Tr. at 438:14-439:22 (Mott)). Mott testified that TSI would record distributions to capital accounts on TSI's tax return for one year but that members would not be able to access the distribution until the following year. (Tr. at 441:19-442:12 (Mott)). For example, Mott testified that distributions taken by members in 2020 would be recorded on TSI's 2019 tax return. (*Id.*).

106. Mott's testimony that she did not believe she had to disclose these capital account distributions does not withstand scrutiny.

107. To begin, question 30 of the SOFA broadly asks whether the "debtor provide[d] an insider with value in any form." (GX 16 at 8). This logically includes payments from the debtor's

bank account to members – even if such money was earmarked as part of a member's capital account.

108. Whereas an innocent person would have asked her lawyer whether she should include certain transfers on the SOFA, Mott did no such thing. (*See* Tr. at 112:25-115:2, 117:20-120:2 (Edmonson); *see generally* GX 65; GX 72; GX 73). Mott did not disclose the missing transfers to R+C or ask questions about any particular transfer she left out. (*See id.*).

109. When Mott did ask a general question, the response confirmed that she *should* disclose transfers from members' capital accounts. In particular, Mott asked Edmonson, "If it is the director's after tax money from a prior tax year does it constitute a 'payment'?" (GX 65 at 1). Edmonson responded that after-tax money "goes more to Question 32" of the R+C questionnaire, which corresponded to question 30 of the SOFA. (GX 65 at 1; *compare* GX 64 at 36 *with* GX 16 at 8). Mott was thus told that payments of a "director's after tax money" – i.e., the money supposedly in their capital accounts – should be disclosed on the SOFA.

110. Perhaps more significantly, Mott's selective disclosure demonstrates her dishonesty. She disclosed a subset of the transfers from TSI to members in an email to her lawyers, and her lawyers included those transfers in response to question 4 on the SOFA. (GX 72; GX 16 at 3). Mott described several of these payments as "K-1 2020" payments – that is, distributions from capital accounts. (GX 72 at 2). Mott dated these K-1 payments to members as occurring in 2021. (*Id.*). It makes no sense that Mott believed she did not have to disclose distributions from capital accounts yet simultaneously disclosed some of those distributions.

111. Notably, TSI's financial records do not support the notion that the money in members' "capital accounts" was considered separate from TSI's money. TSI's books and records were "so incomplete and in disrepair" that it was difficult to know "what's real." (*Supra* ¶ 51).

Further, TSI's 2019 and 2020 K-1s do not reflect any distributions to members despite the fact that TSI's financial records show such distributions. (*Supra* ¶ 54). This is not consistent with the defense's theory that TSI had carefully delineated capital accounts for its members.

112. Mott's credibility with respect to the capital accounts – and much of the substance of her testimony – is further diminished by her pattern of deceitful conduct during bankruptcy proceedings, which is discussed in subsection (iv) below.

ii. Requested Corrections

113. Mott testified that she requested corrections to her SOFA. (Tr. at 470:1-472:13 (Mott)). At trial, Mott maintained that she telephoned her counsel and demanded corrections in writing, but she said that counsel were unhelpful and unresponsive. (*Id.*).

114. This is contradicted by Edmonson's testimony that she could not recall Mott (or anyone else at TSI) asking to amend TSI's SOFA, and that no one at TSI provided her with information that would enable her to amend TSI's SOFA. (Tr. at 142:12-25 (Edmonson)). No evidence was produced at trial – such as call logs or emails – that indicated a legitimate attempt to amend the SOFA.

115. Further, as previously noted, R+C ultimately withdrew from representing TSI, citing TSI's "failure to promptly communicate necessary information." (GX 20 ¶¶ 2, 3(a), 3(b), 4-5).

116. Beyond Mott's self-serving testimony, the only evidence of an attempt to correct the SOFA is an email sent on February 15, 2022, in which Mott stated that "[t]he SOFA and Schedules . . . need to be correct before the interview with the DOJ auditor this Thursday . . . That includes Transfers list for 12 months before the filing. It also needs to be updated." (GX 83). This email was sent nearly three weeks after the SOFA was filed and a week after Mott had been accused of perjury for lying in her deposition. (GX 82). Mott's email also contained no specifics

regarding how to amend the SOFA. (GX 83). This email perhaps shows some regret or panic; it does not show a legitimate attempt to amend representations made in the SOFA.

117. It thus is not credible that Mott legitimately attempted to correct sincere mistakes in the SOFA.

118. Further, even if Mott legitimately attempted to correct the SOFA at some point, this would not meaningfully contradict the government's compelling evidence that Mott intended to hide the truth at the time she signed the SOFA.

iii. Production of Records

119. Mott also testified that she provided every bank statement she had to her lawyers at R+C. (Tr. at 454:4-20, 467:10-468:7 (Mott)).

120. Mott's testimony on this point is also not credible. Two witnesses – Edmonson and Homony – testified that Mott never produced complete financial records for TSI and did not provide a complete set of records for any of TSI's bank accounts. (Tr. at 138:18-140:12 (Edmonson), 163:5-168:9 (Homony)). Contemporaneous emails document R+C unsuccessfully urging Mott to provide documents that the Creditors had requested. (*Supra* ¶ 41; *see also* GX 75; GX 76; GX 77). Further, R+C repeatedly followed up with Mott about missing documents, noting that the creditors believed bank statements and other productions were incomplete. (GX 77; GX 78; GX 84). To this day, the Chapter 7 Trustee is missing "some of the most critical records" from TSI. (Tr. at 164:18-165:24 (Homony)).

121. Mott thus repeatedly withheld and selectively produced documents.

122. In any event, turning over some of the documents that helped prove her statements were false does not raise a reasonable doubt about Mott's deceptive intent.

iv. Pattern of Deceptive Conduct

123. Mott's pattern of deceptive conduct throughout the bankruptcy proceeding further eliminates any doubt that Mott knowingly and fraudulently responded to question 30.

124. For instance, as noted above, Mott failed to provide complete financial records to those who asked, and her legal counsel withdrew due to her behavior. (*Supra* ¶¶ 44, 120).

125. Mott was also repeatedly evasive in her answers under oath in depositions.

126. For instance, in Mott's February 2022 deposition, when asked if she had "an interest in any business that has exchanged money, property, or funds with TSI," Mott responded, "no." (*Supra* ¶ 39). This was despite the fact that TSI SE and Addy Road – two entities that Mott controlled – respectively received more than $2 million and more than $3 million from TSI within two years of TSI filing for bankruptcy. (GX 28C at 2; GX 43B at 2; GX 43A at 1-2; GX 110; Tr. at 237:2-17, 260:20-263:8 (Mathes)). Mott made these transfers herself. (*See* Tr. at 240:9-242:20, 245:2-246:18, 260:20-263:15 (Mathes)).

127. Mott's primary excuses for her faulty deposition testimony are that she was recovering from a COVID infection and a monoclonal-antibody transfusion, and that the exhibit sharing during the deposition was confusing. (Tr. at 477:2-478:24 (Mott)). The Court does not find these excuses to be credible or persuasive. Mott mentioned COVID and the transfusion at the deposition but testified that she was capable of answering questions truthfully. (GX 25 at 10:14-16, 11:21-12:6, 17:4-15). Mott did not simply forget these significant transfers that she made recently to entities that she controlled.

128. During her September 2022 deposition, Mott was asked about Addy Road. Mott testified that she had no recollection of who controlled Addy Road, no recollection of what

business it did, and no recollection of a $3 million payment to from TSI to Addy Road in 2020.[8] (*Supra* ¶ 59). This testimony is not credible. Addy Road was a limited liability company that Mott controlled and through which she had purchased a beach house at the address of 20 Addy Road in Bethany Beach, Delaware. (GX 58. GX 56 at 3-4; Tr. at 484:8-15, 491:6-10, 497:3-13 (Mott)). As noted above, Mott had personally transferred $3 million to Addy Road less than two years before TSI's bankruptcy. (Tr. at 260:20-261:10 (Mott)).

129. Mott also feigned ignorance about various topics during her September 2022 deposition. (*Supra* ¶ 59).

130. Mott's evasive conduct in her depositions fits with what the government has alleged here: a deliberate attempt to conceal assets from creditors.

v. Miscellaneous

131. Mott advanced several other excuses for her false statements – often in passing – that this Court does not find credible or persuasive.

132. For instance, Mott testified that she was rushed in her review of the SOFA. (Tr. at 458:16-459:6 (Mott)). But the evidence presented by the government, including significant back-and-forth communications with R+C regarding the contents of the SOFA, shows her representations were knowing and deliberate. (*See supra* ¶¶ 32, 95-101).

133. Mott also testified that she believed she could amend the SOFA. (Tr. at 460:18-25 (Mott)). Of course, however, even if she did believe that, it would be no excuse for lying in the first instance.

134. Mott also testified that TSI would have remained solvent despite the $6 million judgment "after we collected our receivables," and she indicated her confidence in TSI's prospects

---

8 Mott was also evasive in her testimony about Addy Road in her February 2022 deposition. (*Supra* ¶ 39).

appealing this judgment. (Tr. at 447:14-448:6, 513:14-19 (Mott)). But TSI was clearly struggling financially; after all, it filed for bankruptcy when it was required to post the appeal bond. (*See supra* ¶¶ 20-22). And more importantly, Mott's actions demonstrate that she feared creditors might take assets that she would prefer to keep.

135. Mott's remaining defenses are likewise unpersuasive.

* * *

136. For the reasons above, the government has proven beyond a reasonable doubt that Mott deliberately lied in response to question 30 on TSI's SOFA.

### 2. <u>Question 18: Closed Accounts</u>

137. Question 18 on the SOFA is titled "Closed financial accounts." (GX 16 at 5). It asks: "Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?" (*Id.*). It also provides: "Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions." (*Id.*).

138. In response, the box labeled "None" is filled in, and no accounts are listed. (*Id.*).

139. Mott is responsible for this response to question 18 for the reasons set forth above. (*Supra* ¶ 78).

140. In sum, Mott represented that TSI did not close any financial accounts in the year before filing the bankruptcy case.

#### a. <u>Falsity</u>

141. This representation was false.

142. In the year before TSI's bankruptcy, five of its bank accounts were closed: (1) BBVA/PNC[4] account ending -7965/-1967; (2) BBVA/PNC account ending -2888/-2583; (3)

BBVA/PNC account ending -9759/-0421; (4) TD Bank account ending -3053; and (5) TD Bank account ending -3152. (GX 108; GX 27 at 115; GX 28 at 106; GX 29 at 215; GX 30 at 101; GX 31 at 128; Tr. at 216:7-21 (Mathes)).

**b. <u>Knowing and Fraudulent Intent</u>**

143. Mott made the misrepresentation in response to question 18 with knowing and fraudulent intent.

144. Many of the same reasons applicable to question 30 are relevant here. (*Supra* ¶¶ 90-93). For instance, Mott reviewed and signed the SOFA; she engaged in back-and-forth with R+C when drafting the SOFA; and she was experienced in finance, accounting, and the day-to-day operations of TSI. (*Id.*).

145. No evidence was presented that anyone other than Mott had access to, or the authority to transfer funds to or from, these accounts. (Tr. at 213:18-214:12 (Mathes)).

146. Mott personally opened all five of the bank accounts at issue. (Tr. at 213:18-214:1 (Mathes)).

147. All five of the bank accounts at issue were closed. (Tr. at 216:7-216:17 (Mathes); GX 108). Mott is the one who personally closed the accounts. (Tr. at 216:7-21; GX 30C at 1; GX 31B at 1; GX 28 at 106; GX 29 at 215; GX 27 at 115). She closed the two TD Bank accounts on May 24, 2021 and the three BBVA/PNC accounts in October 2021. (*Id.*).

148. These bank accounts contained varied amounts of money at the time Mott closed them. For instance, TSI's TD Bank account ending -3053 held a balance of $1,822,508.62 on the day it was closed, which Mott withdrew as a closeout debit. (GX 30B at 1; GX 30C at 1; Tr., at 216:18-217:5 (Mathes)). TSI's TD Bank account ending in -3152 held a $470,583.01 balance on the day it was closed, which Mott also withdrew as a closeout debit. (GX 31A at 1; GX 31B at 1;

Tr. at 219:4-23 (Mathes)). TSI's BBVA/PNC account ending -2888/-2583, on the other hand, had a balance of only $1,350.19 on the day it was closed. (GX 28 at 106; Tr. a 216:7-21 (Mathes)).

149. It is not reasonable that Mott would have forgotten about these accounts, particularly because she personally closed them and certain of them had significant balances.

150. Further, Mott did not turn over a significant portion of the records associated with these bank accounts to the Chapter 7 Trustee. (Tr. at 164:4-19, 196:4-10, 200:5-14 (Homony)).

151. This Court thus finds that Mott was aware that she closed several TSI bank accounts in the year prior to the bankruptcy when she represented that no such accounts were closed.

152. In her defense, Mott offered an email exchange between herself and her counsel at R+C that took place six days before the SOFA was filed. In the exchange, Mott asked about a TSI bank account (not one of the five she closed), writing "I'm not sure how to answer this question," and "it seems to me, the account is still open but with a 0 balance." (DX 192). Edmonson responded, "Seems to me the account is still open." (*Id.*).

153. But for several reasons, it is not credible that Mott believed she did not have to disclose zero-balance *closed* accounts.

154. First, Mott's question to R+C – whether she should disclose an *open* account with a zero balance – is different from the question of whether she should disclose a *closed* account with a zero balance.

155. Second, question 18 explicitly demands disclosure of all accounts closed within a year, without offering an exemption for zero-balance accounts. (GX 16 at 5).

156. Third, it is not the case that the five bank accounts at issue here had a zero balance for long before they were closed. Mott withdrew money from the accounts at the time they were closed. (GX 30C at 1; GX 31B at 1; GX 27 at 115; GX 28 at 106; GX 29 at 215).

157. Mott also testified that R+C "had all the bank documents. They are a big firm, they have all kinds of IT software, search tools, all they had to do was look at the closing bank document and see that the bank account was closed, they needed to amend the SOFA question." (Tr. at 472:18-22 (Mott)). But Mott did not provide R+C with all relevant documents, and R+C's normal practice is not to conduct its own financial investigation. (*Supra* ¶¶ 30, 120). Moreover, Mott understood she had an obligation to be truthful regardless of whether she also provided documents.

158. Finally, as discussed in paragraphs 123 through 130, Mott's pattern of deceptive conduct in bankruptcy proceedings further suggests she was intentionally dishonest in her response to question 18.

* * *

159. For the reasons above, the government has proven beyond a reasonable doubt that Mott deliberately lied in response to question 18 on TSI's SOFA.

## IV. **DISCUSSION**

As explained in the factual findings above, the government has proven beyond a reasonable doubt that Mott violated 18 U.S.C. § 152(3) in her responses to questions 18 and 30 on the SOFA. The government has proven each element of the offense beyond a reasonable doubt.

First, Mott made both representations in connection with a bankruptcy proceeding under title 11.[9]

Second, Mott made both representations under penalty of perjury as provided in 28 U.S.C. § 1746.[10]

9 The Defendant does not dispute this. Title 11 of the United States Code governs bankruptcy proceedings, including cases under Chapter 7 and Chapter 11.

10 The Defendant does not dispute that the statements discussed in this opinion were made under penalty of perjury. The perjury language in the SOFA matches the language in 28 U.S.C. § 1746.

Third, the representations were false. There is no reasonable way to construe Mott's responses as truthful.

Fourth, the representations were material. "To be material, a false statement must have 'a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Johnson*, 19 F.4th 248, 256 (3d Cir. 2021) (citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). Mott's false representations about TSI's transfers and bank accounts were certainly "capable of influencing" TSI's creditors, the Bankruptcy Court, and the Chapter 7 Trustee – all of whom could have lacked a full and accurate picture of TSI's finances and prior transfers. Creditors may also have been unable to recover what they were owed under the law. It does not matter that the truth was ultimately uncovered; "[m]ateriality does not require a showing that creditors are harmed by the false statement." *United States v. Lindholm*, 24 F.3d 1078, 1083 (9th Cir. 1994).

Fifth, the representations were made "knowingly and with intent to defraud."[11] The record is replete with evidence that Mott fully understood that her representations were false when she made them; that she intended to deceive creditors and the Bankruptcy Court; and that she intended to hide and keep assets through those false representations. Mott thus acted with the requisite criminal intent.

[11] Statements that are intended to deceive are intended to defraud. *See United States v. Gellene*, 182 F.3d 578, 586 (7th Cir. 1999); *United States v. Sabbeth*, 262 F.3d 207, 217 (2d Cir. 2001); *United States v. Abrams*, 165 F.4th 784, 811 (3d Cir. 2026). "In general, 'knowingly' requires the government to prove that a criminal defendant had 'knowledge of the facts that constitute the offense.'" *United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009) (citations omitted); *see United States v. Zerbach*, 47 F.3d 1252, 1261 (3d Cir. 1995) ("The statutory requirement that the underlying acts be performed 'knowingly' requires only that the act be voluntary and intentional and not that a person knows that he is breaking the law.").

## V. <u>CONCLUSION</u>

For the reasons above, the Court finds Mott is guilty on Count I of the indictment (with respect to the two statements discussed in this opinion) and not guilty on Count II.